Okay, our final case this morning is number 182400, Fraunhofer-Gesellschaft v. Sirius XM Radio. Mr. McPhee. Good morning and may it please the court. Why don't you begin by giving us your order. Absolutely, I suspected you might want to start there and we appreciate the opportunity to address those issues. The first question was whether Section 9.5 of the Master License Agreement requires this court to interpret the MLA according to German law. The answer to that question is no. Under consistent precedent from the regional court, in this case the Third Circuit, where parties do not address issues of foreign law either in the district court or on appeal, the appellate court will consider that issue waived. They'll proceed on the understanding that foreign law either doesn't apply or that any differences between foreign law and U.S. law are not dispositive or relevant for purposes of issues presented on in part on some of the policies. Have you cited those precedents? Well, we haven't because of the issues that have come up for the first time. Just name one. Let me give you the citation. Yes. So we have Belray Co. v. Kemwright, 181 Federal 3rd, 435 at 440-41. This is a Third Circuit 1999 case. They considered a potential issue of South African contract law, but no party had raised any sort of foreign law either in the district court or on appeal. And if the foreign law doesn't apply, what law does? There's no such thing as U.S. law. Well, it's interesting you say that. Including omnipresence in the sky. Right, exactly. So what you'll see is different approaches in some of the cases. So in the Third Circuit case that I just mentioned, the Belray case, what they said is parties generally carry the burden of raising the issue that foreign law may apply and the burden of adequately proving foreign law to enable a court to apply it. Where parties fail to satisfy either burden, the court will ordinarily apply the forum's law. Ordinarily. Ordinarily. So does the Third Circuit say that we lack authority to order the district court to apply the correct law, or that we confined in our discretion that there was a waiver? Under the Third Circuit law, there's no rule of requirement. What you do see is the consistent... Oh, it's within our discretion? It is within this court's discretion. However, I will say that consistently in the Third Circuit law, you find that courts will find waiver on this issue. Okay, we're passing the waiver issue. I mean, the contract specifically says it's governed by German law. So why isn't the issue before us about the effect of a termination of the contract governed by German law? And you're saying setting aside the issue of waiver in this case. So we go to that issue, right? This is the second question that the court asked, really, which is, if we do apply German law in this case, is it possible that Sirius XM somehow maintains or holds on to its sub-license rights? Do those survive under German law? Again, the answer is no. And what I'd like to do is, of course, it's a detailed analysis of German law. It's probably beyond the scope of what we can do in a 30-minute oral argument today. But I want to address... Perhaps why we suggested the possibility of a reading. I'm sure that's true. But let me try to cover at least some high-level principles, as well as go to the two cases that this court mentioned in the second question. So the first key principle of German law that I think is important to understand here is the German law known as the Schutzstatut, or the statute of protection. And what the statute of protection does under German law is it distinguishes between two types or two categories of legal issues that may come up when you're considering a contract. The first set of issues relates to issues relating to the contract itself, formation of the contract, termination, things like interpretation of a term in the contract. For those sorts of issues, they are deemed to fall outside of this statute of protection. And so what you do is you look to the German civil code for answers to how to address those kinds of issues. Germany, of course, is a civil law system, not a common law system. And Fraunhofer actually addressed a few of these civil law principles of German law in the district court below in a few places. We felt that in a few instances, those principles provided some additional support for our positions. Is that the footnote reference to 133 and 157 or something? Yes, there's a reference there and maybe one or two other places it gets mentioned. But by and large, what we find is that applying either German law or, for example, New York law, or the way that that law is applied in federal district courts, we end up getting about the same interpretation of the contract either way. What about the cases that we cited? Don't those cases suggest that even if the master license agreement is terminated, that the sub-license survives? They do not, Your Honor, and this is the point I wanted to get to. So we talked about that first set of issues where you apply the civil code. Under the statute of protection, there's a second set of issues. And these issues have to do with the substantive property right that is addressed in the contract itself. In this case, an intellectual property right. And under the statute of protection, issues about those substantive issues, things like origin of those rights, or transferability, ownership, licensability, those issues are decided under German law by looking to the law of the country where those rights originated. And that is a matter of pretty clear German law. Are you saying that as a matter of choice of law, Germany would look to U.S. law or some version of U.S. law to decide this issue? That's correct, Your Honor. Let's suppose hypothetically that we conclude that Germany would apply its own law. Is it not clear from those cases that under German law that the termination of the master license would not terminate the sub-licensee's rights? It is not, Your Honor. And so if I understand your question, you're asking, let's set aside the statute of protection, this choice of law issue. For whatever reason, Germany has decided that we're going to apply German law to these contracts. So you do look at those decisions first, and you see that they do involve German IP rights, not U.S. IP rights. I understand what you're saying. But there's a number of other important distinguishing features. First of all, the cases both involve copyright law, not patent law. Now under German law, this is a very important distinction. The decisions actually cite to specific statutory provisions of German copyright law that are not present in the German patent statute. And there are numerous salient differences between patent law and copyright law under German law. But you agree that if it were copyright law, termination of the master license would not terminate the sub-license under German law? Under German law, under copyright law, based on these provisions, you would find that, yes, the sub-license would survive under the narrow circumstances of those decisions, not applicable here. And moreover, we find that, in fact, those decisions, by the way, which were issued from the first division of the Germany highest court, which deals with copyright, that sort of issues, not the 10th division, which deals with patent-related issues. To our knowledge, there's been no patent case, certainly nothing at the appellate level, where the principles of those two copyright cases have been applied in the German patent context. Is there a mechanism under German law for a U.S. court to ask the German court to tell us what German law would be in the circumstances here? I want to understand the question. Are you saying, how would the district court go about determining what German law is? No. Is there a provision, you know, as exists within the United States, a federal court can ask a state court to opine on state law if the district court is in doubt about it. Is there a provision that would allow such a reference to a German court, and would the German court answer the question if it were put to it? I don't believe so, or at least I'm not aware of any. My understanding, under Federal Rule of Civil Procedure 44.1, that district courts are allowed to, essentially, with the assistance of the parties, arrive at these issues, for example, by reference to certified translations of foreign law, and in particular, expert analysis. So you get someone who is usually a member of the bar of that foreign court, who can come in and provide assistance to the court in deciding those issues. Unless my colleagues have other questions about this aspect, I have a couple of questions about termination. Under the Supreme Court's decision in the Mission case, it's now clear that the rejection of a contract doesn't terminate the contract in bankruptcy. So if I understand your position, is that your client had a right to terminate the master license agreement for a couple reasons. One, because there was a failure to make this payment of these PTO fees, and second, that it had the right to terminate because of the bankruptcy. And that's correct, right? There are a few different ways to get there. Those are two of the theories that were presented, yes. There was also a theory that under the contract itself, I believe 7.2, a party, if a material provision hasn't been complied with, if there's been a breach, a party may provide notice to the other side that the agreement is terminated. And those breaches would be the failure to pay and the bankruptcy? The failure to pay and or the bankruptcy, in this case. So when did your client elect to terminate the master license agreement? So it happened, there are a few different theories. It happened at the very latest in 2015 when Fraunhofer, in November, exactly. The letter that was provided that the district court didn't consider as part of the motion. And so, but wasn't that the first time that it was terminated? I would say no, Your Honor. So the earliest would have been in 2010 when WorldSpace and Fraunhofer jointly agreed that the master license agreement would be rejected. In other words, this is not a situation where you sometimes see a bankruptcy. A rejection is a termination under the mission. And that's correct, Your Honor. But this isn't a situation where, for example, you have a licensor who has declared bankruptcy and a licensee says, no, no, no, I want to keep that contract. I want to maintain my rights under that contract, even though the licensor is trying to reject it in bankruptcy. Here we had a situation where both Fraunhofer and the licensee, WorldSpace, said, yes, we agree this is rejected. We want to walk away from this contract. So it's a very different situation. The unpaid fees, let me clarify. My understanding is that those were not fees related to the licenses at issue in this case, but they were fees with respect to foreign licenses for PCT applications. Am I correct about that? I'm not sure of the distinction there that you're making, Your Honor. But what I know is that under 7.4 of the master license agreement, it's very clear it states all amounts specified. Yeah, but what I'm asking, I understand what it said. What I'm asking is, are the amounts at issue here related to the patents that are at issue in this case, or to other patent applications? I believe that at least some of the fees were related to the patents at issue in this case, if not the patent families. At the USPTO? That doesn't seem to make sense. No, no, part of the patent families. So the foreign counterparts. But not the actual patents that are issued here? I don't know specifically whether there could have been some fees related, specifically if you're talking about a USPTO. This provision doesn't cover maintenance fees, right? I don't think that's true, Your Honor. I think it could. Really? Nobody's ever taken that position, right? Who's never taken that? Your client's never taken the position that it covers maintenance fees. Under 7.4, if you go to Article 4. No, no, answer my question. Has your client ever taken the position that it covers maintenance fees? It certainly does cover maintenance fees. Has your client ever taken that position? So I don't know that it's ever been objected to or someone has raised this issue that it doesn't cover maintenance fees. We absolutely have taken the position that it covers all prosecution fees. And there's no claim that maintenance fees weren't paid, right? Well, we put in our claim. Has there ever been a claim that maintenance fees were due and not paid? Your Honor, I would need to look at the appendix to see what specifically the line items were in the unpaid proof of claim that was made. It was, I think, 16,000 euros. And there were various fees in there. If it was U.S. maintenance fees, why would it be in Europe? That makes no sense. I think that's right, Your Honor, that it does not cover the U.S. maintenance fees. But again, I go to the language of Article 4, which is very broad. It covers all costs and fees related to the prosecution of these families. No, it says prosecution. It doesn't say maintenance. But that's another issue. If I may, Your Honor, I'd like to just emphasize, this is stepping back a bit, one other... Well, let me actually reserve the rest of my time. Well, you have no time, but we'll give you two minutes. Thank you. Thank you. Mr. Bagdasarian. If I may please the Court. Let me start with the order that the Court issued on this German law issue, if I may. The good news here, Your Honor, whether we apply German law or we apply U.S. law, as Faunhofer is advocating here, the District Court can be affirmed. It's just that simple. The German law is the two cases that this Court brought to the parties' attentions. Both say unequivocally... Well, what's your position? Should we apply German law? Our position is that German law under Section 9.5 governs the National License Agreement. Our position is that you don't need to apply German law in order to resolve this case. But if you do, you can affirm the District Court. If you apply U.S. law, then based on the parties' arguments, that the sub-license and the settlement agreement are separate independent bases to affirm the District Court's opinion here. And the reason for that is the sub-license is governed under New York law. Under the four corners of that agreement, it's an exclusive, irrevocable sub-license to the patents at issue here. And that should end the matter. I guess I really hadn't thought that the contract question that we need to resolve is a contract question about the sub-license, but rather about the master license. I took it as essentially beyond dispute, or maybe actually undisputed, that XM had an unrestricted sub-license from WorldSpace by the time things went south for WorldSpace, and at least by the time of the settlement agreement in the bankruptcy, XM had fully paid everything provided for under the sub-license. So it didn't have any more money to pay to use the patents for the next 10 years, or whatever the life of it was. But the question is, what happens in that circumstance when the master license is terminated? And that is a question of interpreting the master license, which provides that it is subject to German law. Your Honor, the answer to that question, whether it's done under U.S. law, because Bonhoeffer is now in foreman's court under German law, the outcome is the same. Under German law, based on the... Yeah, yeah, yeah, but what's your position? Is your position that German law applies or not? German law applies to the interpretation of the master license agreement. Which is the issue that we have here. It's also the consequences of a breach of the master license agreement. It's not just an interpretation of the agreement itself, it's also a determination of what the consequences of a breach are. Is that governed by German law? Section 9.5 of the MLA says it would be governed by German law. Your Honor, the... And that issue was not addressed by the district court, nor was it raised or argued by the parties. That's correct, Your Honor. So I don't think that issue, we recognize that the court issued an order bringing the parties' attention, but we don't think that issue makes a difference in this case. We don't need to resolve questions of German law to... It would. It would. It would be a question in this case if that was the governing principle. Well, Your Honor, the issue is if it is the governing principle under the cases that this court has brought to our attention, and we have certified translations if the court wants to see them, it is clear and unequivocal by the court in Germany that a sub-license does not terminate. But your opposing counsel has made two arguments as to why those cases are distinguishable. One, they didn't involve U.S. intellectual property rights, and Germany would look to U.S. law if they were U.S. property rights. And second, they say that the German court would treat copyright and patent differently. On the first point, Your Honor, the district court should be affirmed if U.S. law applies here. We can go through the agreements and show how they're not connected in the way. I'm asking about German law. Understood. Are they right that German law, because it's a U.S. intellectual property right, would look to U.S. law? Your Honor, I don't know the answer to that question. What about the second question? The second question, that second question is answered in the decisions that you brought to our attention. In the M2 trade case, the federal court in Germany specifically references a passage in there that they have checked with the 10th Civil Division of the Federal Court of Justice, which is competent for patent law, and has responded that has no objection to the decision in this case. Right, but the no objection could mean it doesn't apply to us, so why do we care? Or it could mean the same rule for patent law. Your Honor, I respectfully submit that if they're going to check with the 10th Division to determine whether their decision on a copyright case would be different in a patent case, that they would alert the bar that that would be the case. So, Your Honor, I think if, as I've said, German law is clear on this point, and we result in affirmance. Separate and apart from that, if we look at the sublicense and the interaction with the master license agreement, as well as the settlement agreement, which was approved and adopted in the context of bankruptcy court, that is a final order by the U.S. court preserving SiriusXM's ongoing sublicense rights. They paid millions of dollars in connection with these licenses. They fulfilled all obligations under the terms of those agreements. And the bankruptcy court made sure to resolve all disputes in connection with that bankruptcy where WorldSpace was present and Fraunhofer was not. Yeah, but the settlement agreement didn't involve Fraunhofer, right? It does not name Fraunhofer's parties between WorldSpace and SiriusXM. Fraunhofer had an opportunity in the context of the WorldSpace bankruptcy as a creditor to WorldSpace to certainly object to that settlement agreement. And they said nothing at that point in time. And it was approved and ordered by the bankruptcy court in connection with the WorldSpace bankruptcy. Let me change the subject a little bit and ask you a hypothetical. Let's suppose in this, the license agreement, that WorldSpace had made the first installment payment of, what, $200,000 and refused to make any more payments. And Fraunhofer had come in and said, you know, you're in breach of the agreement and the agreement is terminated. What would happen to the sub-license under those conditions? If the sub-license had been granted prior to that breach, SiriusXM would continue to have a sub-license under the terms of the agreements. It would. It would. And what would it... There were obligations on Sirius' part to make payments to the licensor to WorldSpace. To whom would those payments go? To whom? To WorldSpace? To WorldSpace. Yes, to WorldSpace. And WorldSpace, the WorldSpace's license is terminated. But nonetheless, WorldSpace continues to receive royalty payments? Well, I think they do. And in the scenario that you're talking, the hypothetical you're talking about, which is not what happened here, Fraunhofer, under those circumstances, would have a breach of contract claim against WorldSpace. So Sirius would be paying to WorldSpace the licenses that it owes, and Fraunhofer, under the breach of contract in your hypothetical, could go and sue WorldSpace for a breach of contract. If the scenario you're contemplating and the termination occurred before any license grant was put in place, well, I think that would be a different scenario. The scenario that you posited was under the terms of the agreements that they had begun to make payments. And I think in particular under these agreements, so Your Honor understands, there was a time period under which the license fees needed to be paid within 30 to 45 days after execution of them. All those payments were made, and the rights were granted. So there were no further payments to be made under the sublicense? There were no further payments to be made under the sublicense. I don't think we have the sublicense. Is it in the record? It is in the record, and I will give you that. It's page 185? Yes. This is the technology license agreement? That's correct, Your Honor. There were a few years of payments that had to be made, but they were all made by the time things went south. Everything was made. And there was a $298,000 payment as part of the settlement agreement to take care of all obligations. To take care of everything else. Number one, to take care of all whatever outstanding amounts were owed. And number two, to confirm and make sure, because Syria saw this. They saw there was a bankruptcy proceeding. They came in specifically to take care of their rights and assure that their rights continued in the context of that settlement. All parties here, plus WorldSpace, were there. Can I ask you, I guess, a record question? And records, I guess, can be thin on 12b6 motions. At the time that XM's predecessor entered into the negotiation to get the sublicense with WorldSpace, having been referred to WorldSpace by Fraunhofer, what does the record say about whether WorldSpace understood, and maybe even more importantly, whether Fraunhofer understood, that XM was licensing technology that it was going to build into its system that was going to be hard to remove? I think all parties understood that that wasn't the case. What kind of evidence? I mean, it seems plausible, but what evidence or assertions that we can count on as evidence explain that background? Because that might affect how the parties, in particular Fraunhofer and WorldSpace, understood the scope of the Section 3 grant to WorldSpace of authority to sublicense. Your Honor, there is... So I'll just stop playing this song. Sure. Your Honor, there is an Exhibit E within the context of the pleadings here, where Fraunhofer identifies a list of technology, including a list of patents, that were identified as relating to the underlying technology to build the SiriusXM broadcast system. As part of that, Fraunhofer specifically directed WorldSpace or XM to obtain their rights to these patents from WorldSpace. That was how Fraunhofer wanted this orchestrated. Fraunhofer knew under that agreement, under their separate agreement, not at the sublicense or the MLA, all the parties understood here, under all these agreements, that the technology that was developed in conjunction with XM and Fraunhofer at the time would be used as part of the repeater network, the retransmission of the satellite broadcast system, you know, here in the United States. That, I don't think, is in dispute at all. And to your reference to Section 3.1 of the Master License Agreement, that is as clear as possible on its face. It has one restriction in the scope of the license grant here. It is limited to the WorldSpace business, and the WorldSpace business is defined as basically satellite radio. There are no other restrictions in the Master License Agreement. That was the only restriction. There are termination provisions. Termination provisions say nothing about conditioning the ongoing rights under the sublicense to the continuation of the license. If I understand what you're saying correctly, is that even if Fraunhofer had the authority to terminate the Master Agreement, that the license had already been granted to Sirius under the sublicense and pursuant to the Master Agreement, and that the termination wouldn't affect that? Correct. And the reason for that is that nothing in the Master License Agreement conditions SiriusXM's ongoing rights on, as the District Court said, the non-termination of the Master License Agreement. Now, Fraunhofer's pulled together some provisions to try to make that case, but it's clear, for example, under Section 7.5. If you look at page 2 of their reply brief, they characterize that provision. The way they characterize that provision, and I can take the Court through it, it is the opposite. It is the opposite of what the actual provision in Section 7.5 says. That's number one. The second provision they point to, Section 7.4, that they characterize as an ongoing payment obligation. And what that agreement actually says is that no termination of the Master License Agreement shall affect the rights, provided that WorldSpace has paid or agrees to pay license fees at the time of termination. So basically, it gives WorldSpace an option at that point. If it's going to be terminated... But it seems to me that there could be a difference between fees to be paid to the PTO for maintenance of the patents, and the failure to pay those might terminate the sub-license. Whereas here, we don't have a situation in which the unpaid amounts relate to the license for the patents at issue here. I agree. The unpaid amounts have nothing to do with the payment of license fees. To the extent there is a claim of non-payment, it's reimbursement for, I think, European patent office fees. You think or you know? I know. What the claim they put in was actually 16,000 euros, which translates into $22,000. It is an invoice from European counsel that goes to either prosecution fees or to maintenance fees in Europe. It has nothing to do with the U.S. We're talking about 16,000 euros or $22,000 that they're using as the foundation to say, okay, there was non-payment under the natural license agreement and that has a cascading effect to now undo the sub-license. When you go to section 7.4 of the MLA, there is not a single word that conditions the ongoing rights of the sub-license in section 7.4. Fraunhofer knew how to put in restrictions into the MLA, and they did that by restricting the world space business. There's not a single word in section 7.4, 7.5, or any of the termination provisions where they say, and they could have said this, remember, they orchestrated this whole thing. I guess they make an argument maybe overstated, but here's a slightly more moderate version of it, that you can get an implicit but only implicit restrictive message out of 7.5 because what 7.5 does is preserve products and services sold prior to the date. One would then argue that that doesn't mean that that covers only the actual physical products or the past services, but not licenses, which is a funny way to talk about products and services, and therefore by omitting that, I realize there's a lot of steps in trying to squeeze a negative implication out of this, but the language is not expressed in saying, as you said, the opposite. Well, I think what Fraunhofer says on page 2 of his fly brief is that article 7.5 makes clear that customers with sub-licensee, like SiriusXM, may not use the license technology with respect to any products sold after termination of the MLA. What, at Appendix 450, what section 7.5 actually says is no termination or expiration of the MLA shall prevent the continued use by customers or customers of sub-licensee of products and services sold prior to the date of termination or expiration. That's a very straightforward provision that says, if it's previously granted, you get to continue to use it. We didn't go on to say that if this was your right to continue to use it. It doesn't say that. It could have. And the Brunswell Treatise and the other support that we've given to you, it's a very easy way to put it into a provision. They orchestrated this deal. And the key point I want to make here is that the use of the term irrevocable is important here. Well, that's a hard one because there are statements about termination of the agreement and I think we're about out of time unless my colleagues have questions. Thank you. If I may briefly, we would agree that the result is the same under German or U.S. law. We just think the result is different. And under U.S. law, in particular, Mitchell versus Hawley, the 1873 Supreme Court case going all the way back, this principle that you can't give what you don't have we think is very well established under U.S. law. And an agreement between WorldSpace and SiriusXM, whatever it looks like, cannot be used to undo the rights of the patent holder, Fraunhofer. I'll say, too, with respect to German law, there are additional distinguishing features with respect to those cases. So, and if this were remanded, we would address those in the district court in the first instance. We think they're pretty significant. I'd also just mention the context of this, of course, is a motion to dismiss. The record, as you mentioned, it is thin, and we don't think that there's sufficient evidence. Certainly, it's not proper for the court to bring in things such as the statement that, well, there was a substantial investment of capital and it was in reliance on a statement that was made. We don't see any of that, of course, in the simple complaint or the amended complaint that Fraunhofer has submitted. You wouldn't expect it, right? You wouldn't expect it. We didn't even get an answer to our complaint in this case. There was this argument that was raised that, well, there's nothing in the MLA that addresses the rights of the sub-licensee or constrains them in any way. I think we've outlined that pretty in a detailed way in the reply brief, but 7.4 and 7.5, it's a clear and well-established principle of contract interpretation that the inclusion of the one excludes the other. In this case, we have statements that say you can continue your rights after termination, provided that payment has been made in full, according to Article 4. And 7.5 says the sub-licensee customers can continue to use products sold before termination. So we think that both of those provisions give a pretty clear implication of what happens and what doesn't happen after termination. Indeed, under SiriusXM's reading of the agreement, those provisions would be completely superfluous. Mr. McPhee, I think we're out of time. Thank you. The case is submitted. That concludes our session.